# McKee *versus* Bidwell.

1. If there be undoubted evidence of clear negligence, the court must so pronounce as matter of law.

2. If there be no doubt as to the facts, yet if there be substantial doubts as to the inferences to be drawn from them, they are for the jury.

3. The plaintiff, in going about nightfall into defendant's building on business, fell through an opening into the cellar. *Held*, that evidence that the defendant afterwards put a light at the opening was admissible on the question of negligence of defendant.

4. Evidence in this case for the jury on the question of negligence.

5. Johnson *v.* Bruner, 11 P. F. Smith 58 ; Penna. Railroad Co. *v.* Barnett, 9 P. F. Smith 259 ; Penna. Railroad Co. *v.* Ogier, 11 Casey 60 ; Catawissa Railroad Co. *v.* Armstrong, 2 P. F. Smith 282, recognised ; Penna. Railroad Co. *v.* Henderson, 1 P. F. Smith 315, followed.

October 9th 1873.  Before READ, C. J., AGNEW, SHARSWOOD, WILLIAMS and MERCUR, JJ.

Error to the Court of Common Pleas of *Allegheny county:* Of October and November Term 1872, No. 139.

This was an action on the case for negligence, brought February 24th 1870, by Alexander McKee against J. C. Bidwell.

The plaintiff was in the employ of John W. Haney & Co., who were engaged in the business of delivering goods arriving in Pittsburg at the different railroad depots to the consignees of the goods. The defendant was the proprietor of the Pittsburg Plough Works, located on Garrison alley.

The works of the defendant, as would appear from the statement in the paper-books and the evidence, are situated on the east side of Garrison alley. North of the building is a yard, extending to Duquesne Way, and along Garrison alley to Duquesne Way is a high fence. At the north end of the building is a gateway into the yard, through which vehicles taking goods to the works pass. The office is at the north-west corner of the building fronting on Garrison alley, from which there is an entrance to it by a door and short flight of steps. There are windows in the office on the north side, looking into the yard. At some distance east of the office there is a large door, opening from the yard into the building. At this door goods brought through the gate from Garrison alley are delivered. In reaching it the vehicles pass the whole length of the north side of the office. In the large door there is a small door about three feet wide. On the west side of the doorway, at about the distance of eighteen or twenty inches from the opening of the large door and about five or six feet from the opening of the little door, there is an opening in the floor about six feet square, for an elevator, which is raised from the cellar to the upper stories. Around this elevator there is no railing or other protection. The office on the east side, that next to the doorway, is closely boarded for four or five feet from the floor, and above that it is glass.

From the office a door opens into the main body of the building. In order to reach this office-door from the large door where goods are delivered, it is necessary to go directly south, through the building, about thirteen feet, and, turning to the west, reach the inside door of the office, at the distance of eight or nine feet further.

About five o'clock on the afternoon of the 26th of November 1869, the plaintiff brought on his dray a load of goods for the defendant. He delivered them at the large door, and, for the purpose of going to the office to get a receipt for their delivery, he turned *immediately* towards the west to go to the office, and fell into the opening for the elevator. For the injuries received by the fall he brought this suit.

On the trial of the case, November 24th 1873, the court (Stowe, J.) nonsuited the plaintiff. It is necessary, therefore, to state the evidence somewhat at large.

The plaintiff testified that he started, with Henry Perry, from the depot to deliver two boxes and a barrel to the defendant. The goods were marked in a book which he had with him. He entered the yard from Garrison alley with the load, and put the goods on a platform, opposite the door where goods are taken into the building. There was no one there to sign the receipt for the goods. The evening was dark. It was the first time he had been there. "I looked and saw a light in the office; I started there to get my book signed; I went the nearest way to the office; I made about a second step when I fell down the elevator place; there was no light burning close to the door; none except that in the office; * * * my business was to go with the goods, see the goods taken off, and get the book signed; the driver does the driving; I stand behind; it was raining a little and getting dark; I could not see the place I was going; I could see plainly outside; just going into the house made it pretty dark inside; I could not see very well; I saw a clear way to the office; I could see there was nothing in my way on the floor; I was looking where I was going."

Henry Perry, the driver of the dray, testified substantially as the plaintiff. He said also that he had delivered goods there two or three times before, and, upon inquiry at the office, he was directed to take goods to the platform in the yard. He saw no place in Garrison alley for the delivery of freight. When they delivered the goods there was no one there to receipt for them. The goods were delivered on the platform, and the door through which the plaintiff entered was the small door in the large door.

J. W. Haney, the employer of plaintiff, testified : " The business of McKee was to get his book signed when delivering goods. We cannot deliver goods without getting a receipt in a book of that kind."

W. Wilson testified that he had been employed in delivering goods for Haney, and took the goods into the yard through Garrison alley, delivered them on the platform, got his book signed and "always went in the building to the office." The book was sometimes signed at the platform and sometimes in the office. No person ever warned witness not to come in that way. Witness never saw a notice·not to go that way posted at the door. A person in the office could see a team going into the yard.

Charles Turner, also in the employ of Haney, testified that he frequently delivered goods for defendant at the platform, and sometimes met his clerk at the door and sometimes went through the building to the office. There was no place in Garrison alley to deliver freight. The opening of the elevator is not in front of the large door in the yard where the goods were delivered. Never was notified not to go through the building to the office.

Henry A. Breed testified: "1869 was in service of defendant, clerk in his office; was in office at time plaintiff was hurt. Part of goods from depot were delivered at platform, some at the shed opposite, and some at office-door on alley; it depended very much upon their bulk. The large boxes of bolts were generally delivered at shed; boxes of paints and other things at platform. It depended more upon where they were to be used in the building, than upon the bulk. The greater portion was delivered at some place in the yard, after having gone in the gate. Generally it was light goods that were delivered on alley; the goods from depot were generally taken into yard. It was the business of any of the clerks who happened to be at hand to sign dray-books. Persons in office can see wagon pass the window in the yard. There is a window in wall facing the elevator opening. There was no gas-burner nearer than twenty or twenty-five feet to opening in floor; there was no barricade around opening. There were seventy-five or eighty workmen in this establishment; may have been more. Our men generally took the goods into building after they were left upon the platform. This door at platform was as much a thoroughfare as any door about the building. The first floor is occupied by machinery almost altogether, except at the door. This door is as much a thoroughfare, except it may be the door on alley. The office occupies one corner of the main building, thirty feet by eighteen feet, perhaps. Two doors open into office; there is none from yard into office; the only way to get to office is through the door on Garrison alley or through this door; this door at platform is about eight feet wide; there is a smaller door in it, on left-hand side as you come from the opening, about three feet wide. The opening for elevator is about eighteen or twenty inches from front of large door. This was an elevator used for hoisting things with; one side of elevator was open, next door; the other side was enclosed. * * * There was one door faced the door on

[McKee v. Bidwell.]

Garrison alley; the other was on the side next elevator opening, on side of office which adjoined opening; there was a space' partitioned off, adjoining elevator for a wash and coal room. You passed out this door, went straight forward for eight or nine feet, then turned and went to the left, for perhaps thirteen feet, which would bring you to door opening on platform; the door on Garrison alley has a platform with steps leading up. There is quite a large double door which leads into a small space or entry. There was a sign above it, ' Office.' It is nailed on door-cheek and projects; the letters were probably six or eight inches in size; there is no glass in door, but a large glass above it, perhaps twenty lights of 8 by 10 glass. The sign is above the door. Immediately opposite this door is an opening into the works, and diagonally across entry is a door leading into office. On the door leading into works in the entry, there was a notice, ' No admittance without permission from the office.' The door on Garrison alley is thirty feet from corner. The door into works is generally closed; open when there is any necessity for it. There are windows look-out into alley between door and where you turn into open space. * * * The long way of office is perhaps twenty feet, and that brings you to the elevator. This glass partition is the division between office and elevator; the wall of building makes another side of elevator : this closet partitioned off, and opening into the office formed another side of elevator, and the fourth side next this large door at platform was open; when the small door at platform was open, the side of it is five or six feet from elevator. One entering there would have to go four if not five paces before he came to opening of elevator; in going from the door in large one to go to office-door you would go directly forward for thirteen or fourteen feet, and about five feet from elevator, as you would go forward you would draw a little to the right; having gone thus far you would go directly to the right; around this partition forming the closet, go forward eight or nine feet to office-door. You could not get into office by going across this elevator, there is no door there. Was on premises before and after accident; there was no obstruction in this passage from small door at plat-form to office-door; it was open; there was a notice at this platform door, ' No admittance without permission from the office;' think it · read, ' Positively no admittance,' &c. It was nailed on the cheek of door furthest from gate; it was plain.

" We received a good deal of freight and shipped a good deal from this large door. There was a two-story building across this open space; there was a door in it opposite the large door. This small door was used for persons running in and out, for carrying small packages through, and for running a wheelbarrow through. This door, which I have described, is as much a thoroughfare as any other; was used by workmen about the building, going in and

out building and attending to their work about the yard; that is what I meant by a thoroughfare, that it was used by the men employed about building, as much as any other door; the manufactory was in operation at the time of accident; the fans were in operation; they made quite a large noise—a heavy noise and jarring. The elevator was in use at time of accident. I might say it is in constant use, almost constantly passing from one floor to another, it may seldom stand idle, we use it for moving material from one floor to another; there are five stories in building and a cellar. My recollection is, that it was pretty dark, think it was fifteen or twenty minutes after five that accident occurred; we stop factory one-quarter to six. It was a dark Monday evening; it was nearly night, still twilight to a certain extent, but was rapidly getting on to be dark. Gas was lit in office. We usually light up on such an evening about four or half past four o'clock. * * * The persons who used this door were workmen; and persons who delivered freights there went into that door and went in there. Having entered that door, they would go around to office-door. We generally came out to receive the freight; when persons went in they would go in and around to office-door; sometimes they would come to window and rap; when they did come in, they would go in that way. When loading or unloading elevator, this opening was used; things were carried over it. The sign was legible; it had been up some time, and bore weather-marks; it faced the entrance, so that a person entering yard could see it; in such a way as this, we could not see it very far."

The plaintiff proposed to show that, immediately after the accident, defendant put up a gas-light close to the opening of the elevator at the door. The offer was objected to by defendant, rejected by the court, and a bill of exceptions sealed for the plaintiff.

The plaintiff having closed his case, the defendant moved the court to order a nonsuit. The court allowed the motion; Judge Stowe saying :—

" I am of opinion that the plaintiff has shown a case which, as a matter of law, makes it my duty to declare that the plaintiff was guilty of negligence or want of due care, in attempting to get to defendant's office in the manner and under the circumstances detailed in the evidence, which contributed to the accident, and therefore am compelled to allow the motion for nonsuit, with leave to move the court in banc to take off the same."

The court in banc afterwards refused to take off the nonsuit.

The plaintiff removed the record to the Supreme Court, and assigned for error that the court erred—

1. In rejecting his offer of evidence.
2. In ordering a judgment of nonsuit.

[McKee v. Bidwell.]

*J. H. Hampton* (with whom was *J. Dalzell*), for plaintiff in error.—In cases of controverted facts, whose existence or not may be presumed to affect the mind, the question of negligence is for the jury: Pennsylvania Railroad v. Ogier, 11 Casey 71; Reeves v. Delaware, Lackawanna and Western Railroad, 6 Id. 454; Pennsylvania Railroad v. Zebe, 9 Id. 318; North Pennsylvania Railroad v. Heileman, 13 Wright 60; Pittsburg and Connellsville Railroad v. McClurg, 6 P. F. Smith 297; Pennsylvania Railroad v. Barnett, 9 Id.; Johnson v. Bruner, 11 Id. 58; Kay v. Pennsylvania Railroad Co., 15 Id. 273. If an owner of property allows others a use of it that tends to produce a belief that the use will not be objected to, he must exercise his rights so as not to mislead others to their injury: Sherman and Redfield on Negligence, § 11; Barrett v. Railway Company, 1 Foster & Finlason 361; Hepburn v. McDowell, 17 S. & R. 384; Indermaur v. Dames, 2 Law Rep. 313. The evidence rejected was admissible: Pennsylvania Railroad v. Henderson, 1 P. F. Smith 315; West Chester and Philadelphia Railroad v. McElwee, 17 Id. 311.

*W. S. Purviance* (with whom was *S. A. Purviance*), for defendant in error.—The facts here were not controverted. It was for the court to determine as to negligence: Catawissa Railroad v. Armstrong, 2 P. F. Smith 286; Pittsburg and Connellsville Railroad v. McClurg, 6 Id. 297. If the plaintiff could see his way, it was his own negligence, if he could not he should not have gone on without a light: 1 Hurlst. & C. 633; Waters v. Wing, 9 P. F. Smith 211.

The opinion of the court was delivered, November 10th 1873, by
Mercur, J.—It is well settled that in a case of undoubted evidence of clear negligence, it is the duty of the court to pronounce it such as matter of law: Pennsylvania Railroad Co. v. Ogier, 11 Casey 60; Catawissa Railroad Co. v. Armstrong, 2 P. F. Smith 282; Pittsburg and Connellsville Railroad Co. v. McClurg, 6 Id. 294. If, however, there is no doubt as to the acts committed, yet if there be substantial doubts as to the inferences to be drawn from these acts, they should be submitted to the jury: Pennsylvania Railroad Co. v. Barnett, 9 P. F. Smith 259; Johnson v. Bruner, 11 Id. 58.

What is and what is not negligence in a particular case, is generally a question for the jury, and not for the court. This arises from the fact that the question of ordinary and reasonable care is generally involved. The degree of care required is changed by the circumstances of the case. Some circumstances require a higher and some a lesser degree of care. Hence generally negligence is a mixed question of law and fact. Under proper instructions it should usually be submitted to the jury, to find whether proper care has been exercised under the particular circumstances.

The plaintiff was in the employ of Haney & Co., whose business was to convey goods from the railroad depots to the merchants in the city of Pittsburg, to whom they were consigned. They had, upon several previous occasions, delivered goods to the defendant in the yard and upon the same platform where the goods were delivered at the time of the injury. Henry Perry, who was in company with the plaintiff, and driving the horses, testified that he had delivered goods there two or three times before the injury, and that " this time the way was open into the yard." William Wilson and Charles Turner, both employees of Haney & Co., each testified to having delivered goods to the defendant upon the same platform. Wilson swears: " I got my book signed after I took them off the dray. I always went in the building to the office. The opening stands to the right of the large door. There is a door opening from office to wareroom. This is the only entrance I ever got in. The office is probably twenty-five or thirty feet from the large door. Sometimes the book was signed in the office when I went in, and sometimes was signed at the platform outside. No person ever did admonish or warn me not to come in that way. The person who came out of the office to receipt the book came through the building the same way that I went in."

Turner swears that he went through the building to the office to have the receipt signed, and " was never notified not to go into office through the building."

Henry N. Breed, an employee of the defendant, testified that the door at platform leading into the building " was as much a thoroughfare as any door about the building." Subsequently he explained, saying: " I meant by a thoroughfare that it was used by the men employed about the building as much as any other door." Again he says: " the persons who used this door were workmen, and persons who delivered freights there went into that door and went in there." Having entered that door, they would go around to office-door. " We generally came out to receive freight. When persons went in, they would go in and around to office door; sometimes they would come to window and rap; when they did come in they would go in that way."

It is true, Breed testified that on the door leading into the building was a notice—" No admittance without permission from the office." The plaintiff swears he did not see this notice; nor does it appear that any of the employees of Haney & Co. ever saw it.

As matter of fact, it appears that the employees of Haney & Co., who delivered goods to the defendant, did, without permission from the office, pass in through that door on their way to the office to get a receipt; and this, so far as is shown, without any objection on the part of the defendant.

[McKee v. Bidwell.]

At the time of the injury, the plaintiff was in company with the driver of the team, assisting in the delivery of the goods to the defendant. He was further charged with the duty of procuring a receipt therefor. With the receipt-book in his hands, he entered the door on the way to the office, for the purpose of procuring the receipt. In ignorance of the hole, passing along, with the gaslight from the office thrown in his face, but not upon the hole, he fell therein. He had entered the same door through which other employees of Haney & Co. had been accustomed to pass for a like purpose. The plaintiff was at the defendant's works for a lawful purpose, and upon business which made it proper for him to go to the office. Whether he had a right to enter that particular door which he did enter, for the purpose of passing to the office, and whether, having entered, he was afterwards guilty of negligence, should have been submitted to the jury. We think, therefore, the learned judge erred in directing a nonsuit.

Upon the question of the defendant's negligence, we think the evidence covered by the first assignment of error will be admissible. Where a person was killed while standing upon a platform between two tracks, by a passing train overlapping a portion of the platform, it was held admissible to show that the railroad company caused the platform to be removed the day after: Pennsylvania Railroad Co. v. Henderson, 1 P. F. Smith 315. The same principle is affirmed in West Chester and Philadelphia Railroad Co. v. McElwee, 17 P. F. Smith 311.

  Judgment reversed, and a *venire facias de novo* awarded.

Agnew, J.—I doubt as to the question of concurring negligence on the part of plaintiff, upon the facts in evidence.